## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT A. LASLAVIC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )          Civil Action No. 11-684 |
| | ) |
| PRINCIPAL LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**Conti, District Judge**

### I.     Introduction

This matter involves a challenge to the termination of long-term disability benefits

previously received by an eligible individual over the course of several years.  Pending before

the court is a motion for summary judgment filed by defendant Principal Life Insurance

Company ("Principal").[1]  (ECF No. 29.)  For the reasons that follow, that motion will be denied.

### II.     Background

Plaintiff Scott A. Laslavic ("Laslavic") was born on December 13, 1971.  (ECF No. 28-4,

PLIC 2015.)  He dropped out of school after completing the tenth grade at Seneca Valley High

School.  (ECF No. 28-2, PLIC 1026.)  He obtained his General Educational Development

certification in 1991.  (ECF No. 28-6, PLIC 2640.)  In 1998, Laslavic was employed by

Wholesale Auto Services, Inc. ("Wholesale Auto") as a body shop repairman.  (ECF No. 41 ¶ 1.)

As an employee of Wholesale Auto, he qualified as a participating "Member" under a disability

---

[1] Principal was previously known as "Principal Mutual Life Insurance Company."  (ECF No. 5.)

insurance policy provided by Principal.[2]   (*Id.*)  The policy defines the term "disability" as

follows:

**Disability; Disabled**

A Member's inability, solely and directly because of sickness or injury:

a.      during the Benefit Waiting Period and the two year period immediately
        following the Benefit Waiting Period:

1)      if not working, to perform the majority of the material duties of his
        or her normal job; or

2)      if working, to earn more than 80% of his or her Indexed
        Predisability Earnings; and

b.      after completion of the Benefit Waiting Period and the two year period
        immediately following the Benefit Waiting Period:

1)      if not working, to perform the majority of the material duties of
        any job that reasonably fits the Member's background and training;
        or

2)      if working, to earn more than 66 2/3% of his or her Indexed
        Predisability Earnings.

(ECF No. 1-1 at 9.)  The "Benefit Waiting Period" referenced in the policy begins with the onset

of a "disability" and continues for a period of six months.  (*Id.* at 21.)  The plain language of the

policy indicates that an individual who is unable "to perform the majority of the material duties

of his or her normal job," but capable of performing "the majority of the material duties of any

job that reasonably fits [his or her] background and training" ceases to be "disabled" after the

expiration of the Benefit Waiting Period and the ensuing two years.  (*Id.*)

Laslavic applied for short-term disability benefits on November 13, 1998, alleging that he

was "disabled" because of "shin splints."  (ECF No. 41 ¶ 3.)  Principal approved the application

and started to pay benefits to Laslavic.  (*Id.* ¶ 4.)  In a letter dated March 12, 1999, Natasha

Johnson ("Johnson"), a customer consultant employed by Principal, informed Laslavic that his

---

[2]

eligibility for long-term disability benefits was being considered.  (ECF No. 28-4, PLIC 1982.)

In the letter Johnson stated that since Laslavic's disability was not expected to continue for

twelve months, it was not necessary for him to apply for benefits under the Social Security Act,

42 U.S.C. §§ 401-33, 1381-83f.  (ECF No. 28-4, PLIC 1984.)  Johnson explained that such an

application would need to be submitted if the length of Laslavic's disability were to change.

(*Id.*)

Laslavic was approved for long-term disability benefits on April 16, 1999.  (ECF No. 41

¶ 5.)  He was informed of this approval in a letter from Becky Trickey ("Trickey"), a client

consultant for Principal, dated June 9, 1999.  (ECF No. 28-4, PLIC 1964-66.)  The letter stated

that Laslavic was entitled to a monthly payment in the amount of $958.81.  (ECF No. 28-4, PLIC

1965.)  This amount was roughly equivalent to two-thirds of Laslavic's monthly earnings.  (*Id.*)

The policy directs that the amount of an individual's monthly benefit be reduced by "all

payments for the month received by [him or her] under the first-party income replacement

provisions of a motor vehicle policy" obtained pursuant to Pennsylvania's Motor Vehicle

Financial Responsibility Law ("MVFRL"), 75 PA. CONS. STAT. § 1701 *et seq.*  (ECF No. 1-1 at

22.)  Trickey's letter advised that Laslavic's "monthly benefit" could be affected by his receipt of

"income from other sources," and that he should notify Principal of any such income in order to

"avoid a possible overpayment of [his] disability claim."  (ECF No. 28-4, PLIC 1965.)

On January 10, 2000, Laslavic was seriously injured in a motor vehicle accident.  (ECF

No. 41 ¶ 6.)  The accident occurred when his vehicle was struck "head-on" by a vehicle operated

by Douglas Lample ("Lample").  (ECF No. 28-7, PLIC 2733.)  After the collision, Laslavic went

to the emergency room at St. Francis Hospital Cranberry ("St. Francis") in Cranberry,

Pennsylvania, complaining of pain in his neck, left shoulder and lower back.  (ECF No. 28-7,

PLIC 2739.)  X-rays revealed that none of his bones had been fractured.  (*Id.*)  Laslavic was

discharged with prescriptions for pain medication and instructed to wear a cervical collar.  (*Id.*)

During the course of the ensuing year, Laslavic continued to experience pain in his back.

(ECF No. 28-7, PLIC 2757-62.)  A magnetic resonance imaging ("MRI") scan of his lumbar

spine conducted on June 28, 2000, revealed that he had degenerative disc disease with associated

bulging and disc protrusion.  (ECF No. 28-7, PLIC 2767.)  On November 10, 2000, Dr. Robert

M. Sutherland administered an epidural steroid injection to Laslavic's back.  (ECF No. 28-7,

PLIC 2773-2774.)  A provocative discography performed on November 30, 2000, detected the

presence of a "posterior radial tear."  (ECF No. 28-7, PLIC 2775-76.)

On January 17, 2001, Laslavic underwent a "[l]umbar decompression and radical

discectomy at L5-S1 with interbody fusion and iliac graft."  (ECF No. 28-7, PLIC 2781.)  The

operation was performed by Dr. Daniel M. Bursick and Dr. Eric M. Altschuler at Mercy Hospital

in Pittsburgh, Pennsylvania.  (ECF No. 28-7, PLIC 2778-80.)  After the surgery, Laslavic

received additional treatment for his back pain.  (ECF No. 28-7, PLIC 2783-93.)  He continued

to receive long-term disability benefits during that period of time.  (ECF No. 41 ¶ 14.)

In the aftermath of his surgery, Laslavic started to undergo physical therapy through

Phoenix Rehabilitation and Health Services, Inc. ("Phoenix").  (ECF No. 28-2, PLIC 1311-12.)

The objective of the therapy sessions was to enable him to return to work in a "light or modified

duty capacity."  (ECF No. 28-2, PLIC 1312.)  During the summer of 2001, Dr. Bursick requested

that a functional capacity evaluation be conducted to determine whether Laslavic could work.

(ECF No. 28-2, PLIC 1307.)  Daniel W. Glatz ("Glatz"), a physical therapist affiliated with

Phoenix, performed the evaluation on July 24, 2001.  (*Id.*)  After completing the evaluation,

Glatz reported that Laslavic could perform tasks at the "light" level of exertion.  (ECF NO. 28-2, PLIC 1309.)

Dr. Dennis J. Courtney, a treating physician, administered a "three-dimensional lifting assessment" on August 22, 2001, to ascertain Laslavic's "ability to perform lifting tasks."  (ECF No. 28-3, PLIC 1345.)  During the assessment, Laslavic "demonstrated the ability to perform medium work" under the standards defined in the Department of Labor's Dictionary of Occupational Titles ("DOT").  (ECF No. 28-1, PLIC 0896; ECF NO. 28-3, PLIC 1347.)  In a letter dated September 27, 2001, Dr. Courtney stated:

> Mr. Laslavic is currently being treated by me with a trigger point injection program with concomitant physical therapy modalities.  He is not permitted to work in any capacity during this treatment.  Once treatment has concluded, Mr. Laslavic's work capacities will be evaluated to determine safe restrictions and limitations for his return to work in some capacity.  I have reviewed Mr. Laslavic's pre-injury job description from Wholesale Auto Rehabilitation.  As the prognosis for Mr. Laslavic every [sic] returning to the type of heavy duty work he has done in the past is poor, I have instructed him to consider retraining options that would enable him to obtain future employment in a sedentary or light capacity, once he is medically released to do so.  Functional capacity testing performed also supports my opinion.

(ECF No. 28-7, PLIC 2802.)  The letter was addressed to an undisclosed recipient.  (*Id.*)

Laslavic ultimately brought a claim against Lample to recover damages stemming from the accident.  (ECF No. 28-7, PLIC 2733.)  The parties settled the claim for $15,000.00, which was the maximum amount of liability coverage available to Lample under a policy provided by New Hampshire Indemnity Insurance Company.  (ECF No. 28-7, PLIC 2732-33, 2842.)  Viewing the amount of the settlement to be insufficient to compensate him for his injuries, Laslavic made a claim for underinsured motorist ("UIM") coverage through his automobile insurance policy with State Farm Insurance Company ("State Farm").  (ECF No. 28-7, PLIC 2733-37.)  On December 22, 2003, State Farm paid $165,000.00 to Laslavic.  (ECF No. 41 ¶

101.)  After deductions for counsel fees and expenses, Laslavic received a net recovery in the amount of $109,495.90.  (ECF No. 28-7, PLIC 2840.)

Investigators employed by Omega Insurance Services ("Omega") monitored Laslavic's daily activities between April 27, 2005, and April 29, 2005.  (ECF No. 28-5, PLIC 2122.)  Videotapes depicting his conduct were created.  (ECF No. 28-5, PLIC 2122-29.)  An investigative report prepared by Omega personnel described instances in which Laslavic had worked in his yard with a noticeable limp.  (ECF No. 28-5, PLIC 2124, 2128.)  The report attributed Laslavic's limp to an impairment in his left leg.  (*Id.*)

Thomas D. Wood ("Wood"), a physical therapist, performed a physical work performance evaluation of Laslavic on May 26, 2005.  (ECF No. 28-2, PLIC 1196-1202.)  After completing the evaluation, Wood opined that it was "difficult to predict" whether Laslavic could engage in light work activities over the course of an eight-hour workday, since he had "refused to attempt one or more of the endurance tasks" included within the assessment.  (ECF No. 28-2, PLIC 1201.)  Given Laslavic's "individual tolerance for sitting," Wood observed that it was "clinically reasonable" to assume that Laslavic could "tolerate some light work" for an entire workday.  (*Id.*)

An MRI scan of Laslavic's lumbar spine performed on August 17, 2005, detected "postoperative changes with metallic artifact present."  (ECF No. 28-1, PLIC 0718.)  Some "enhancing posterior scar tissue consistent with epidural fibrosis" was also found.  (*Id.*)  A report describing the results of the MRI scan was later submitted to Principal.  (ECF No. 28-2, PLIC 1060.)

Mary Krug ("Krug"), a claim representative employed by Principal, assumed responsibility for Laslavic's claim during the summer of 2005.  (ECF No. 28-2, PLIC 1146.)

During a telephone interview conducted on August 18, 2005, Laslavic told Krug that he had not yet reached a settlement with State Farm concerning his UIM claim.  (*Id.*)  Krug advised Laslavic that she would need to see a copy of the settlement agreement once the matter was resolved.  (*Id.*)  In a letter to Laslavic dated August 22, 2005, Krug explained that any part of a "future settlement" attributable to "lost wages or earnings" would be "subject to integration" with his benefits under the policy, and that he "would be expected to repay such an overpayment with the first monies received from such settlement."  (ECF No. 28-2. PLIC 1066.)  She stated that any portion of a settlement "representing pain and suffering, medical expense[s] or physical impairment" would not be "subject to integration" with his disability benefits.  (*Id.*)  Krug reiterated these points in subsequent letters to Laslavic dated November 9, 2005, and February 2, 2006.  (ECF No. 28-2, PLIC 1057-61.)

Laslavic was interviewed by David A. Zak ("Zak"), a vocational consultant, on July 26, 2006.  (ECF No. 28-2, PLIC 1020-27.)  In a written report summarizing the interview, Zak explained:

> Scott Laslavic reports he would like to work.  However, he does not know what he could do based on his limitations.  He emphasized his need to consistently alternate his body positioning even when taking pain medication.  At this time he does not believe he would be able to work.  He does not believe and [sic] employer will be able to accommodate his need to sit, stand, and lie down when working.

(ECF No. 28-2, PLIC 1027.)  Zak concluded his report by stating that Laslavic had expressed a willingness to explore options permitting him to work from home.  (*Id.*)

Principal retained Facticon, Inc. ("Facticon"), to investigate Laslavic's activities on August 22, 2006, August 23, 2006, and September 6, 2006.  (ECF No. 28-2, PLIC 1012-18.)  Investigators working for Facticon obtained videotaped footage of Laslavic riding a lawn tractor

while wearing "a full plastic back brace." (ECF No. 28-2, PLIC 1012-13.) This activity was apparently recorded at 12:47 P.M. on September 6, 2006. (ECF No. 28-2, PLIC 1016.)

The terms of the policy expressly permit Principal to have a claimant examined by a physician "during the course of a claim" for the purpose of determining whether he or she is entitled to disability benefits. (ECF No. 1-1 at 27.) On March 12, 2007, Dr. Anna Matthew performed an independent medical examination of Laslavic. (ECF No. 28-2, PLIC 0980.) In a written report detailing the findings of her examination, Dr. Matthew described Laslavic's "perception of pain" as "much more severe than his demonstrated abilities." (ECF No. 28-2, PLIC 0986.) She expressed the view that he could "return to work in a restricted fashion consistent with a sedentary, light, or up to medium strength level." (*Id.*) Dr. Matthew partially based her opinion on the videotaped footage provided by Facticon. (ECF No. 28-2, PLIC 0987.) In her examination report, Dr. Matthew made the following observations:

> Appropriate physical restrictions based upon medical findings on examination, as well as his observed activity level as seen on surveillance videos, is consistent with a modified work level consistent with a medium level of work as noted by the Department of Labor. He would be able to sit continuously with the opportunity to shift or change positions periodically, stand and walk continuously with the opportunity to take customary work breaks every two hours, and perform material handling of up to 50 pounds occasionally, 25 pounds frequently, and 10 pounds continuously. This would include that of lifting, carrying, pushing, and pulling of up to 50 pounds maximum, 25 pounds frequently, and 10 pounds continuously.

(*Id.*) Dr. Matthew concluded her report by stating that Laslavic's physical capabilities had not "regressed" since Dr. Courtney's assessment of August 22, 2001. (*Id.*)

On June 11, 2007, Rene Haigh ("Haigh"), a vocational consultant, completed an employability assessment and labor market survey to determine whether jobs consistent with Laslavic's abilities and limitations existed within driving distance to his home. (ECF No. 28-1,

PLIC 0669-73.)  In a written report signed on June 28, 2007, Haigh identified several positions

falling within Laslavic's profile.  (*Id.*)  After reviewing the results of Haigh's assessment and the

other evidence contained in the claim file, Principal personnel determined that Laslavic was no

longer "disabled" under the policy.  (ECF No. 28-1, PLIC 0668.)  This determination was

communicated to Laslavic in a letter from Krug dated July 23, 2007.  (ECF No. 28-1, PLIC

0656-66.)  The letter explained that Laslavic's benefits had been terminated as of July 19, 2007.

(ECF No. 28-1, PLIC 0665.)

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et*

*seq.*, requires "every employee benefit plan" to "afford a reasonable opportunity to any

participant whose claim for benefits has been denied for a full and fair review by the appropriate

named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  Krug's letter of July

23, 2007, informed Laslavic of his right to seek reconsideration of Principal's decision to

terminate his long-term disability benefits.  (ECF No. 28-1, PLIC 0665-66.)  On November 6,

2007, Dr. William S. Zillweger, Laslavic's primary care physician, submitted a statement to

Pennsylvania's Department of Public Welfare ("DPW") declaring Laslavic to be "permanently

disabled."  (ECF No. 28-6, PLIC 2730-31.)  Through written correspondence dated December

19, 2007, Laslavic asked Principal to reconsider its decision to discontinue his benefits.  (ECF

No. 28-1, PLIC 0650-51.)  The request for reconsideration was accompanied by a December 11,

2007, letter from Dr. Zillweger stating that Laslavic was "permanently disabled" "until proven

otherwise."  (ECF No. 28-1, PLIC 0652.)  In his letter, Dr. Zillweger expressed the view that

Laslavic "would have great difficulty performing the duties of any job on a daily basis."  (*Id.*)

Byron Smith ("Smith"), a claim analyst for Principal, informed Laslavic on January 22, 2008,

that he had forty-five days to submit medical records from Dr. Zillweger.  (ECF No. 28-1, PLIC 0843-0844.)

On May 1, 2008, Laslavic protectively applied for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  (ECF No. 28-6, PLIC 2642.)  He alleged that he had become "disabled" on January 10, 2000, which was the date of his motor vehicle accident.  (*Id.*)  On his application, Laslavic reported that he had stopped working on June 1, 1998, due to "shin splints."  (ECF No. 28-6, PLIC 2634.)

Smith arranged for Laslavic to undergo another independent medical examination.  (ECF No. 28-1, PLIC 0712.)  The examination was performed by Dr. James L. Cosgrove on May 16, 2008.  (ECF No. 41 at 53.)  In a written report discussing the findings of his examination, Dr. Cosgrove described Laslavic's condition as "stable" and recommended "no further diagnostic or therapeutic treatment."  (ECF No. 28-1, PLIC 0722-23.)  Dr. Cosgrove opined that Laslavic "would be suitable for only full-time sedentary or very carefully selected light duty endeavors."  (ECF No. 28-1, PL 0723.)

Laslavic's file was referred to Amanda J. Ruhland ("Ruhland"), a rehabilitation consultant, for a vocational assessment.  (ECF No. 28-1, PLIC 0783.)  In a written report dated July 16, 2008, Ruhland identified several jobs falling within Laslavic's profile.  (ECF No. 28-1, PLIC 0735-49.)  A copy of Ruhland's report was forwarded to Smith.  (ECF No. 28-1, PLIC 0734.)

On August 5, 2008, Dr. Samuel I. Han performed a consultative physical examination of Laslavic in connection with his application for SSI benefits.  (ECF No. 28-6, PLIC 2678-82.)  Based upon the findings of his examination, Dr. Han reported that Laslavic could sit for two to three hours, and stand or walk for one to two hours, during the course of an eight-hour workday.

10

(ECF No. 28-6, PLIC 2678.)  Laslavic was deemed to be capable of lifting or carrying up to ten

pounds on a frequent basis and up to twenty pounds on an occasional basis.  (*Id.*)  Dr. Han

indicated that Laslavic was precluded from crouching, balancing or climbing, and that he was

limited to only occasional bending, kneeling and stooping.  (ECF No. 28-6, PLIC 2679.)  It was

also noted that Laslavic needed to avoid heights, vibration and moving machinery.  (ECF NO.

28-6, PLIC 2679.)

Principal ultimately decided to reaffirm its prior decision terminating Laslavic's disability

benefits as of July 19, 2007.  (ECF No. 28-1, PLIC 0613.)  Smith informed Laslavic's counsel

about Principal's decision in a letter dated August 11, 2008.  (ECF NO. 28-1, PLIC 0613-30.)

The letter made reference to Laslavic's right to challenge the decision by commencing an action

under the ERISA.  (ECF NO. 28-1, PLIC 0628.)  In the letter Smith stated that, under the terms

of the policy, "an additional level of voluntary appeal" was available to Laslavic.  (*Id.*)

Dr. Michael J. Niemiec, a nonexamining medical consultant, reviewed the documents

submitted in support of Laslavic's application for SSI benefits.  (ECF No. 28-6, PLIC 2654-55.)

The examination reports completed by Dr. Matthew and Dr. Cosgrove were among those

documents.  On August 18, 2008, Dr. Niemiec opined that those reports were entitled to

"controlling weight"[3] under regulations promulgated by the Commissioner of Social Security.

(ECF No. 28-6, PLIC 2655.)  Dr. Han's assessment was deemed to be "less persuasive."  (*Id.*)

Dr. Niemiec expressed the view that Laslavic could engage in "light"[4] work activities involving

only occasional postural maneuvers.  (ECF No. 28-6, PLIC 2650-53.)  Pennsylvania's Bureau of

---

[3] A medical opinion is entitled to "controlling weight" only if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record."  20 C.F.R. § 416.927(c)(2).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. § 416.967(b).

Disability Determination (the "Bureau") denied Laslavic's SSI claim on August 19, 2008.  (ECF No. 28-6, PLIC 2604.)

State Farm paid $62,500.00 to Laslavic on June 9, 2009.  (ECF No. 28-7, PLIC 2841.) This sum was apparently provided to Laslavic in order to settle the claim arising out of the motor vehicle accident.  (ECF No. 41 ¶ 104.)  After counsel fees and costs were deducted, Laslavic was left with $37,095.27.  (ECF No. 2807, PLIC 2841.)

Laslavic commenced this action in the Court of Common Pleas of Butler County, Pennsylvania, on April 19, 2011, alleging that Principal breached its contractual obligations under the policy by terminating his disability benefits.  (ECF No. 1-1 at 2-5.)  On May 23, 2011, Principal removed the case to this court pursuant to 28 U.S.C. § 1441.  (ECF No. 1.)  The removal was predicated on a provision of the ERISA purporting to pre-empt breach-of-contract claims of the kind asserted by Laslavic.  29 U.S.C. § 1144(a).  In a letter dated December 28, 2011, Laslavic's counsel notified Principal's counsel about the payments that State Farm had made to Laslavic.   (ECF No. 28-7, PLIC 2732.)

Principal filed a motion for summary judgment on June 22, 2012.  (ECF No. 29.)  In addition to the dismissal of this action, Principal seeks the creation of a constructive trust to ensure compensation for the "overpayments" made to Laslavic as a result of his alleged failure to disclose his receipt of settlement proceeds from State Farm.  (ECF No. 31 at 20-23.)  The motion for summary judgment filed by Principal is the subject of this memorandum opinion.

III.    **Standard of Review**

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED. R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary

judgment against a party who fails to make a showing sufficient to establish an element essential

to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts

in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or

her favor.  *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially

on the moving party to demonstrate that the evidence contained in the record does not create a

genuine issue of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d

Cir. 2004).  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could

render a finding in favor of the nonmoving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d

Cir. 2005).  Where the nonmoving party will bear the burden of proof at trial, the moving party

may meet its burden by showing that the admissible evidence contained in the record would be

insufficient to carry the nonmoving party's burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must

go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions,

admissions or answers to interrogatories showing that there is a genuine issue of material fact for

trial.  *Id.* at 324.  The nonmoving party cannot defeat a well-supported motion for summary

judgment by simply reasserting unsupported factual allegations contained in his or her pleadings.

*Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.   Discussion

Laslavic commenced this action in the Court of Common Pleas as a breach-of-contract

action arising under Pennsylvania law.[5]  (ECF No. 1-1 at 4-5.)  Principal removed the case to this

court on the ground that Laslavic's breach-of-contract claim is pre-empted by the ERISA.  (ECF

---

[5] Laslavic continues to treat this case as if it involved a common-law breach-of-contract claim.  He makes no reference to the ERISA in his brief in opposition to Principal's motion for summary judgment.  (ECF No. 37.)

No. 1.)  The ERISA defines the term "employee welfare benefit plan" to mean, *inter alia*, "any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . ."  29 U.S.C. § 1002(1).  The generic terms "employee benefit plan" and "plan" are defined broadly enough to include an "employee welfare benefit plan."  29 U.S.C. § 1002(3).  Laslavic qualifies as a "participant" within the meaning of these definitions.  29 U.S.C. § 1002(7).  Since the disability insurance policy at issue in this case provides "participants" with "benefits in the event of . . . disability," it is a "plan" governed by the ERISA.  29 U.S.C. § 1002(1), (3).

The Supremacy Clause of the United States Constitution declares the laws of the United States to be "the supreme Law of the Land," "any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. CONST., art. VI.  The United States Supreme Court has recognized that "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  The ERISA explicitly supersedes "any and all State laws" that "relate to any employee benefit plan" established or maintained "by any employer engaged in commerce or in any industry or activity affecting commerce," or "by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. §§ 1003(a)(1), (2), 1144(a).  For this reason, "any state-law cause of

action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004).  Given that Laslavic's claim against Principal clearly relates to an "employee benefit plan," it must be analyzed within the statutory framework established by the ERISA, rather than in accordance with common-law contract principles.  *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 573-74 (3d Cir. 2006).

Section 502(a)(1)(B) of the ERISA, which is codified at 29 U.S.C. § 1132(a)(1)(B), permits a "participant" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Since Laslavic seeks "to recover benefits due to him" under the disability insurance policy issued by Principal, and to "enforce" and "clarify" his rights thereunder, his claim is grounded in § 1132(a)(1)(B).  *Eichorn v. AT&T Corp.*, 484 F.3d 644, 651-653 (3d Cir. 2007); *Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F.Supp.2d 33, 42 (W.D.Pa. 2011).  The ERISA specifically permits an "employee benefit plan" to "sue or be sued . . . as an entity."  29 U.S.C. § 1132(d)(1).  Laslavic sued Principal rather than the plan, i.e. the disability insurance policy.  (ECF No. 1-1 at 2-5.)  His claim is based solely on his alleged entitlement to disability benefits.  (ECF No. 1-1 at 4-5, ¶¶ 5-11.)  He does not allege that Principal breached a fiduciary duty owed to him.  Therefore, the court will treat Laslavic's ERISA claim as a claim brought against Principal only in its capacity as the administrator of the policy.[6]  *Graden v. Conextant Sys., Inc.*, 496 F.3d 291, 301 (3d Cir. 2007).  In the event that Laslavic's entitlement to benefits is established, Principal can be directed to provide such benefits from the assets of the policy.  *Hahnemann Univ. Hosp. v. All Shore, Inc.*,

---

[6] Where a plan does not specifically designate an "administrator," the "plan sponsor" is treated as the plan's "administrator" under the ERISA.  29 U.S.C. § 1002(16)(A)(ii).

514 F.3d 300, 308 (3d Cir. 2008).  Under these circumstances, Laslavic cannot obtain a "money judgment" against Principal in its individual capacity.  29 U.S.C. § 1132(d)(2).

### A.      The Viability of Laslavic's Claim

The ERISA does not contain specific language establishing a judicial standard of review for claims arising under § 1132(a)(1)(B).  *Haisley*, 776 F.Supp.2d at 42.  In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989), the Supreme Court explained that the standard of review in a case arising under that provision should be determined by reference to trust law. "Consistent with established principles of trust law," the Supreme Court clarified that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard" unless the benefit plan in question provides the relevant administrator or fiduciary with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire*, 489 U.S. at 115 (emphasis in original).  Pursuant to this line of reasoning, a deferential standard of review is appropriate only where such "discretionary authority" is granted to the administrator or fiduciary.  *Metro. Life Ins.Co. v. Glenn*, 554 U.S. 105, 111 (2008).  Where a deferential standard of review is applicable, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"  *Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (2010) (quoting *Firestone Tire*, 489 U.S. at 111).

As the administrator of the policy, Principal bears the burden of establishing the applicability of a deferential standard of review.  *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011).  The policy does not contain language delegating authority to Principal to "determine eligibility for benefits" or "construe the terms" of coverage.  *Firestone Tire*, 489 U.S. at 115.  Principal concedes that its decision terminating Laslavic's disability benefits is subject to *de novo* review in this action.  (ECF No. 31 at 8.)  Consequently, this case turns directly on

16

whether Principal *correctly* discontinued Laslavic's disability payments. *Viera*, 642 F.3d at 413-414. In this situation, Principal's decision can be "accorded no deference or presumption of correctness." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002).

Where a deferential standard of review applies, a court may consider only the evidence that was before the plan administrator at the time of the challenged decision. *Sivalingam v. Unum Provident Corp.*, 735 F.Supp.2d 189, 194-95 (E.D.Pa. 2010). In contrast, a court reviewing a benefits decision *de novo* has discretion to consider "any supplemental evidence" presented by the parties. *Viera*, 642 F.3d at 418. Principal insists that the factual dispute about whether Laslavic is "disabled" under the policy should be decided on the basis of the administrative record. (ECF No. 39 at 8-9.) It is worth noting that the "record" relied upon by Principal includes the Bureau's decision denying Laslavic's application for SSI benefits. (ECF No. 28-6, PLIC 2604.) That decision postdated the administrative decision challenged in this case. (ECF No. 31 at 19, n. 15.) In any event, limiting the inquiry to the evidence that was before Principal at the time of its decision would be "contrary to the concept of *de novo* review." *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1184 (3d Cir. 1991)(emphasis in original) (quoting *Moon v. Am. Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989)). The Bureau's decision, as well as the evidence relied upon to make that decision, may be considered for the purpose of determining whether Principal correctly terminated Laslavic's disability benefits under the policy. *Viera*, 642 F.3d at 418.

While it is undisputed that the discontinuation of Laslavic's disability benefits is subject to *de novo* review in this action, the parties apparently disagree about whether the matter should be decided solely on the basis of the existing record. Laslavic maintains that the different opinions expressed by treating and examining physicians render summary judgment

inappropriate.  (ECF No. 37 at 4.)  Principal invites the court to determine the credibility of the competing medical opinions without conducting a trial.  (ECF No. 39 at 8-9.)

A plaintiff proceeding against a plan under § 1132(a)(1)(B) has no right to a jury trial.[7] *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1355-1357 (10th Cir. 2009); *Patton v. MFS/Sun Life Fin. Distrib., Inc.*, 480 F.3d 478, 484 (7th Cir. 2007); *Cox v. Keystone Carbon Co.*, 894 F.2d 647, 649-50 (3d Cir. 1990).  A trial conducted in this case would be a bench trial. The extent to which a bench trial should impact the propriety of summary judgment is not entirely clear.  Under similar circumstances, the United States Court of Appeals for the Third Circuit has suggested that "[i]f the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a *de novo* review of the record of the administrator's decision, making its own independent benefit determination."  *Luby*, 944 F.2d at 1185 (emphasis in original; footnote omitted).  In this vein, the *de novo* review discussed in *Firestone Tire* can sometimes be conducted without the introduction of testimonial evidence.  *Id.*  In *O'Hara v. National Union Fire Insurance Co. of Pittsburgh*, 642 F.3d 110, 116 (2d Cir. 2011), the United States Court of Appeals for the Second Circuit explained that a district court reviewing an administrative decision *de novo* is "obliged to proceed in traditional summary judgment fashion" unless "the parties consent to a bench trial on [their] submissions."  *O'Hara*, 642 F.3d at 116. The reasoning employed in *O'Hara* indicates that, in the absence of such consent, genuine issues of material fact preclude the entry of summary judgment.  *Id*.

Laslavic did not consent to a course of action permitting the court to make factual findings based solely on the documentary record.  As an initial matter, he did not file a cross-motion for summary judgment.  In addition, he specifically argued that "summary judgment is

---

[7] Since Laslavic does not seek *legal* relief, he enjoys no right to a "trial by jury" under the Seventh Amendment to the United States Constitution.  U.S. CONST., AMEND. VII; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708-11 (1999).

not appropriate" because the evidentiary record reveals the existence of a "factual dispute." (ECF No. 37 at 4.)  Therefore, the court's assigned task is limited to determining "whether genuine issues of material fact exist for trial."  *O'Hara*, 642 F.3d at 116.

In an attempt to impugn the reliability of Principal's termination decision, Laslavic contends that the decision to discontinue his disability benefits was made without an identifiable "change" in his medical condition.  (ECF No. 37 at 5.)  This argument is unavailing.  Laslavic's initial receipt of benefits was attributable to his inability "to perform the majority of the material duties of his . . . normal job."  (ECF No. 1-1 at 9.)  After the expiration of his "Benefit Waiting Period" and the ensuing two-year period prescribed by the policy, he was entitled to continuing benefits only if he was unable "to perform the majority of the material duties of *any job*" reasonably consistent with his "background and training."  (*Id.*)(emphasis added).  Since the underlying definition of the term "disability" changed, no change in Laslavic's condition was necessary to justify the termination of his benefits.

Principal continued to provide Laslavic with benefits for several years after the definitional "change."  That fact, however, is not dispositive.  Principal was not estopped from terminating Laslavic's disability payments simply because it had continued to make such payments after the expiration of the two-year period.  *Miller v. American Airlines, Inc.*, 632 F.3d 837, 849 (3d Cir. 2011).  The language of the policy clearly contemplates the procurement of periodic physical examinations to evaluate a recipient's continuing eligibility for benefits.  (ECF No. 1-1 at 27.)  Principal's initial decision to terminate Laslavic's benefits was apparently triggered by the results of Dr. Matthew's consultative examination.[8]  (ECF No. 28-2, PLIC 0986-

---

[8] The documentary record indicates that Laslavic cancelled independent medical examinations that had been scheduled by Principal personnel.  (ECF No. 28-2, PLIC 0999, 1196.)  Principal's delay in terminating Laslavic's benefits after the definitional "change" may have been partially attributable to his failure to appear for consultative

87.) The intervening examination findings provided Principal with a logical basis for concluding that Laslavic was no longer "disabled." *Miller*, 632 F.3d at 848 ("An administrator's reversal of its decision to award a claimant benefits *without receiving any new medical information to support this change in position* is an irregularity that counsels towards finding an abuse of discretion.")(emphasis added).

The existence of a reasonable basis for terminating Laslavic's benefits does not end the inquiry. As discussed earlier, the instant case turns on the *correctness* of Principal's decision rather than on its *reasonableness*. *Viera*, 642 F.3d at 413. Summary judgment is precluded if reasonable minds could differ about whether Laslavic was able to work as of July 19, 2007. *O'Hara*, 642 F.3d at 116.

Laslavic insinuates that the word "reasonably," as used in the language of the policy definition at issue, renders the meaning of the term "disability" ambiguous. (ECF No. 37 at 4.) He goes on to assert that the ambiguous language must be construed in his favor, and that the definition should be interpreted to mean that Principal cannot rely on opinions expressed by doctors of its own choosing in determining whether he is "disabled." (ECF No. 37 at 4.) This argument is manifestly unpersuasive. It is true that ambiguous policy language must be construed in favor of Laslavic and against Principal. *Viera*, 642 F.3d at 419-20. Laslavic, however, fails to identify an ambiguity which relates to the factual issues presently in dispute. The policy language defines the term "disability" as a participant's "inability, solely and directly because of sickness or injury . . . to perform the majority of the material duties of any job that *reasonably* fits [his or her] background and training." (ECF No. 1-1 at 9 (emphasis added).) The modifier "reasonably" pertains to a given job's consistency with a claimant's "background and

---

physical examinations. If that is the case, Principal cannot be faulted for failing to discontinue Laslavic's disability payments sooner.

training."  (*Id.*)  It does not relate to his or her ability "to perform the material duties of" a

particular job.  Laslavic does not argue that the jobs identified by Haigh and Ruhland were

incompatible with his "background and training."  Instead, he argues that he remains unable "to

perform the material duties of" those jobs.  (ECF No. 37 at 4-5.)  Since Laslavic challenges

Principal's *medical* findings rather than its *vocational* findings, his argument concerning the

word "reasonably" is inconsequential.[9]

 After completing a consultative physical examination on March 12, 2007, Dr. Matthew

opined that Laslavic was capable of engaging in "medium" work activities.  (ECF No. 28-2,

PLIC 0987.)  Relying on Dr. Matthew's examination findings, Haigh identified several jobs

falling within Laslavic's vocational profile.  (ECF No. 28-1, PLIC 0669-75.)  After reviewing

Haigh's vocational assessment, Principal personnel concluded that Laslavic was no longer

"disabled" within the meaning of the policy.  (ECF No. 28-1, PLIC 0668.)  When Laslavic

sought reconsideration of the decision terminating his benefits, Principal made arrangements to

have him examined by Dr. Cosgrove.  (ECF No. 28-1, PLIC 0840.)  Dr. Cosgrove examined

Laslavic on May 16, 2008.  (ECF No. 41 ¶ 53.)  Based upon the findings of his examination, Dr.

Cosgrove found Laslavic to be "suitable for only full-time sedentary or very carefully selected

light duty endeavors."  (ECF No. 28-1, PLIC 0723.)  Dr. Cosgrove's examination findings

provided the medical background for Ruhland's vocational assessment.  (ECF No. 28-1, PLIC

0735.)  In a written report, Ruhland identified several jobs that were consistent with the abilities

and limitations described by Dr. Cosgrove.  (ECF No. 28-1, PLIC 0735-49.)  Principal

reaffirmed its earlier decision denying further disability payments to Laslavic.  (ECF No. 28-1,

PLIC 0613.)

---

[9] Given that Laslavic's argument is irrelevant to the factual issues in this case, the court has no occasion to consider
whether the policy is ambiguous with respect to the applicable vocational factors.  *Viera v. Life Ins.  Co. of  N.  Am.*,
642 F.3d 407, 419-20 (3d Cir. 2011).

Laslavic essentially argues that the disagreement between Dr. Matthew and Dr. Cosgrove about whether he was capable of performing "medium" work precludes the entry of summary judgment in favor of Principal.  (ECF No. 37 at 4.)  This argument simply does not make sense.  Under the applicable definition of the term "disability," a participant qualifies for benefits only if he or she is unable "to perform the majority of the material duties of *any job* that reasonably fits [his or her] background and training."  (ECF No. 1-1 at 9 (emphasis added).)  The definition does not turn on whether a given job involves duties performed at a particular level of exertion.  Dr. Matthew and Dr. Cosgrove both believed Laslavic to be capable of working in *some* capacity.  (ECF No. 28-1, PLIC 0724; ECF No. 28-2, PLIC 0987.)  The fact that they disagreed about whether Laslavic was capable of engaging in "medium" work activities is of no dispositive significance.

In a letter dated December 11, 2007, Dr. Zillweger stated that Laslavic "would have great difficulty performing the duties of *any job* on a daily basis."  (ECF No. 28-2, PLIC 0652 (emphasis added).)  Dr. Zillweger described Laslavic as being "permanently disabled."  (*Id.*)  This characterization of Laslavic's condition was consistent with Dr. Zillweger's earlier statement to the DPW.  (ECF No. 28-6, PLIC 2731.)  Principal was not required to accord Dr. Zillweger's opinion "special deference."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  In the present context, however, that opinion constitutes evidence weighing against the assessments provided by Dr. Matthew and Dr. Cosgrove.  *O'Hara*, 642 F.3d at 116.

Although the record pertaining to Laslavic's application for SSI benefits was not before Principal at the time of the challenged decision, it can be considered for the purpose of determining whether Laslavic is "disabled" under the applicable policy definition.  *Viera*, 642 F.3d at 418.  After performing a consultative physical examination of Laslavic on August 5,

2008, Dr. Han indicated that Laslavic could sit for two to three hours, and stand or walk for one

to two hours, during the course of an eight-hour workday.  (ECF No. 28-6, PLIC 2678.)  Dr. Han

reported that Laslavic could never crouch, balance or climb, and that he was limited to only

occasional bending, kneeling and stooping.  (ECF No. 28-6, PLIC 2679.)  Environments

involving exposure to heights, vibration and moving machinery were deemed to be threats to

Laslavic's welfare.  (*Id.*)  Dr. Han opined that Laslavic could satisfy the lifting and carrying

requirements of "light" work.  (ECF No. 28-6, PLIC 2678.)

Based on a review of the documentary evidence submitted in support of Laslavic's

application for SSI benefits, Dr. Niemiec found Laslavic to be capable of performing "light"

work activities involving only occasional postural maneuvers.  (ECF No. 28-6, PLIC 2649-55.)

The opinions of Dr. Matthew and Dr. Cosgrove[10] were credited over the opinion of Dr. Han.

(ECF No. 28-6, PLIC 2655.)  Dr. Niemiec concluded that Laslavic's subjective complaints of

disabling symptoms were only "partially credible."  (*Id.*)  The Bureau denied Laslavic's SSI

claim one day later.  (ECF No. 28-6, PLIC 2604.)

Dr. Matthew, Dr. Cosgrove and Dr. Niemiec each took the position that Laslavic was

capable of performing the duties of some jobs.  (ECF No. 28-1, PLIC 0713-27; ECF No. 28-2,

PLIC 0979-88; ECF No. 28-6,  PLIC 2649-55.)  Dr. Zillweger unambiguously declared that

Laslavic was "permanently disabled."  (ECF No. 28-1, PLIC 0652.)  When viewed in relation to

an eight-hour workday, Dr. Han's examination findings supported a determination that Laslavic

could not maintain a full-time job.  (ECF No. 28-6, PLIC 2678.)  Because the opinions expressed

by Dr. Matthew, Dr. Cosgrove and Dr. Niemiec are in direct conflict with those expressed by Dr.

Zillweger and Dr. Han, a genuine issue of material fact exists about whether Laslavic was

---

[10] The narrative portion of Dr. Niemiec's report makes reference to an unspecified "opinion" provided by Principal. (ECF No. 28-6, PLIC 2655.)  Since Dr. Matthew is mentioned by name, the court considers that the other "opinion" referred to by Dr. Niemiec is the one supplied by Dr. Cosgrove.

"disabled" under the policy definition during the period of time postdating July 19, 2007. *O'Hara*, 642 F.3d at 116.  The introduction of testimonial evidence is appropriate when a claim arising under the ERISA "require[s] consideration of complex medical questions or issues regarding the credibility of medical experts."  *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993).  Since the existing record contains "conflicting medical opinions and evidence," a bench trial must be conducted to determine whether Laslavic remains entitled to disability benefits.  *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003).

In support of its motion for summary judgment, Principal submitted videotape which showed Laslavic engaging in certain activities with a noticeable limp.  (ECF Nos. 32 & 33.)  The footage presented by Principal appears to be the same footage described in the written reports prepared by Omega and Facticon.  (ECF No. 28-2, PLIC 1012-18; ECF No. 28-5, 2122-29.)  In certain instances, visual evidence presented in the form of a recording can warrant the entry of summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378-81 (2007).  Under these circumstances, however, the documentary evidence of disability contained in the record is not "blatantly contradicted" by Principal's visual evidence.  *Id.* at 380.  Dr. Han reported that Laslavic could sit, stand or walk for a maximum of five hours over the course of a standard workday.  (ECF No. 28-6, PLIC 2678.)  While such a limitation may be inconsistent with an ability to maintain a full-time job, it is not necessarily inconsistent with an ability to engage in the limited activities illustrated in the depictions presented by Principal.  "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981).  Although the sporadic activities engaged in by Laslavic may be suggestive of an ability to perform full-time work, they do not inevitably

compel the conclusion that he is capable of maintaining a job.  *Armstrong v. Califano*, 599 F.2d 1282, 1285 (3d Cir. 1979).

For the foregoing reasons, Principal's motion for summary judgment will be denied. (ECF No. 29.)  A bench trial will be held to determine whether Laslavic remains eligible for long-term disability benefits under the terms of the policy.  *McKeehan*, 344 F.3d at 793.  No opinion is expressed about whether he will ultimately be able to demonstrate his entitlement to benefits thereunder.

### B.      Principal's Request for the Creation of a Constructive Trust

Pursuant to the terms of the policy, the monthly benefits paid to Laslavic were to be decreased in an amount equal to "all payments for the month received by [him] under the first-party income replacement provisions of a motor vehicle policy."  (ECF No. 1-1 at 22.)  Trickey's letter dated June 9, 1999, which informed Laslavic that his application for long-term disability benefits had been approved, instructed him to notify Principal of income received "from other sources" in order to "avoid a possible overpayment of [his] disability claim."  (ECF No. 28-4, PLIC 1965.)  State Farm paid $165,000.00 to Laslavic on December 22, 2003.  (ECF No. 28-7, PLIC 2840.)  During a telephone interview conducted on August 18, 2005, Laslavic told Krug that he had not yet settled his UIM claim with State Farm.  (ECF No. 28-2; PLIC 1146.)  Krug advised Laslavic that she "would need a copy of his settlement with State Farm" after the matter was resolved.  (*Id.*)  In letters dated August 22, 2005, November 9, 2005, and February 2, 2006, Krug reminded Laslavic that any portion of a settlement recovery representing "lost wages or earnings" would be "subject to integration" with his disability benefits, and that he "would be expected to repay such an overpayment with the first monies received from such settlement." (ECF No. 28-2, PLIC 1058, 1061, 1066.)  In those letters, Krug went on to clarify that any

portion of a settlement recovery "representing pain and suffering, medical expense[s] or physical impairment" would "not be subject to integration" with Laslavic's disability benefits.  (*Id.*)  On June 9, 2009, State Farm paid $62,500.00 to Laslavic.  (ECF No. 28-7, PLIC 2841.)  Principal first learned of the payments totaling $227,500.00 on December 28, 2011, when its counsel was informed of the payments through a letter sent by Laslavic's counsel.[11]  (ECF No. 28-7, PLIC 2732.)

In connection with its motion for summary judgment, Principal moves for the creation of a constructive trust to account for the alleged overpayment of benefits resulting from Laslavic's failure to acknowledge the settlement payments that he had received from State Farm.  (ECF No. 29-1; ECF No. 31 at 20-23; ECF No. 39 at 12-13.)  Laslavic contends that the UIM payments made by State Farm did not constitute "first-party benefits," and that they were provided solely for the purpose of compensating him for his "pain and suffering."  (ECF No. 37 at 7.)  Principal argues that UIM coverage constitutes "first-party coverage," and that the settlement payments made by State Farm were partially attributable to Laslavic's "lost income."  (ECF No. 39 at 12-13.)

UIM coverage is ordinarily considered to be "first-party coverage."  *Cont'l Cas. Co. v. Pro Machine*, 916 A.2d 1111, 1117 (Pa.Super.Ct. 2007); *Woglemuth v. Harleysville Mut. Ins. Co.*, 535 A.2d 1145, 1150 (Pa.Super.Ct. 1988).  Consequently, the settlement payments received by Laslavic constituted "first-party benefits."  Nonetheless, the plain language of the policy provides that only the amounts recovered under "the first-party *income replacement* provisions of a motor vehicle policy" can diminish the monthly amount of an individual's disability benefits.  (ECF No. 1-1 at 22 (emphasis added).)  The existing documentary record does not

---

[11] Although Laslavic intimates that Principal may have known about the payments prior to December 28, 2011, he points to nothing in the record which supports his suspicion.  (ECF No. 41 at ¶ 100.)

clearly establish the extent to which State Farm's payments to Laslavic were provided to

compensate him for lost income.

In a letter to State Farm dated July 22, 2003, Laslavic's counsel sought a payment in the

amount of $300,000.00, which was equal to the stacked limits of the UIM coverage available

under the motor vehicle insurance policy.  (ECF No. 28-7, PLIC 2735.)  In that letter, Laslavic's

counsel stated:

> Mr. Laslavic's injuries have dramatically reduced his ability to enjoy the
> pleasures of life and have caused him severe emotional distress, inconvenience,
> embarrassment and years of pain and suffering.  Mr. Laslavic cannot do many
> simple tasks without extreme pain.  He is unable to participate in many family
> activities and has suffered intense emotional distress and increased irritability.
> It is likely that Mr. Laslavic will never be able to return to the level of
> work and income that he was able to engage in prior to the accident.  Mr. Laslavic
> is currently receiving benefits under his Long Term Disability plan which
> compensate him for only 66 2/3% of his pre-injury income.  As a result, he has
> lost, and will continue to lose, a significant amount of income as a result of his
> injuries.

(ECF No. 28-7, PLIC 2735.)  The first paragraph of this quoted passage indicates that Laslavic

sought compensation for his pain and suffering.  Relying on the second paragraph, Principal

maintains that the payments made by State Farm were partially attributable to the difference

between Laslavic's predisability earnings and the amount of his disability benefits.  (ECF No. 31

at 22; ECF No. 39 at 12-13.)  Laslavic's argument would only be prevailing if the entirety of the

proceeds collected under his UIM policy constituted compensation for his "pain and suffering."

(ECF No. 37 at 7.)

Although the record contains specific information detailing the counsel fees and costs

deducted from the settlement payments, it does not contain an itemized breakdown of the injuries

for which Laslavic was being compensated.  (ECF No. 28-7, PLIC 2840-41.)  The $227,500.00

ultimately paid by State Farm was less than the $300,000.00 demanded by Laslavic.  (ECF No.

28-7, PLIC 2732, 2735, 2840-41.)  The payments were, in all likelihood, at least partially

attributable to Laslavic's "pain and suffering."  (ECF No. 28-7, PLIC 2735.)  Laslavic started to

receive benefits under Principal's policy *before* the motor vehicle accident.  (ECF No. 41 ¶¶ 4-

6.)  Since the payments from State Farm were made pursuant to a UIM policy, they could not

have been attributable to income lost by Laslavic *prior* to the accident.  The plain language of

Principal's policy provides that the offset for payments received by an individual "under the first

party income replacement provisions of a motor vehicle policy" is to be calculated on a monthly

basis.  (ECF No. 1-1 at 22.)  The payments made by State Farm could offset Laslavic's disability

benefits only for the months postdating the accident, and only to the extent that those payments

were attributable to lost income.  The amount of money owed to Principal (if Laslavic owes any

amount of money to Principal) simply cannot be gleaned from the record at present.

In any event, Principal's request for the creation of a constructive trust cannot be granted

under the present circumstances.  Principal recognized when filing its notice of removal that the

present controversy is governed by the provisions of the ERISA and must be analyzed within its

statutory framework.  *Hooven*, 465 F.3d at 573.  A policy provision requiring a participant or

beneficiary to reimburse a plan for overpayments may be inconsistent with the ERISA.  *Ryan v.

Federal Express Corp.*, 78 F.3d 123, 127-28 (3d Cir. 1996).  While Principal's request for the

establishment of a constructive trust may be consistent with the ERISA's "basic purpose," there

is no basis for disregarding "the words of its text regarding the *specific* issue under

consideration."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993)(emphasis in original).

Where the statutory language speaks to the precise issue presented in a case, a court is not free to

"fashion additional ERISA claims . . . under the guise of federal common law."  *Curcio v. John

Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994).

Although the request for the creation of a constructive trust is not entirely clear on this point, Principal appears to rely on 29 U.S.C. § 1132(g).  (ECF No. 31 at 23.)  Subparagraph (2) of that section permits a plan to seek "unpaid contributions" owed by any employer "who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement."  29 U.S.C. §§ 1132(g)(2)(A), 1145.  It, however, does not speak to a plan's attempt to seek reimbursement for overpayments made to an otherwise eligible participant.

The vehicle for obtaining the reimbursement sought by Principal is 29 U.S.C. § 1132(a)(3), which provides that "[a] civil action may be brought . . . by a participant, beneficiary, *or fiduciary* (A) to enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain other *appropriate equitable relief* (i) to redress such violations or (ii) to enforce . . . the terms of the plan."  29 U.S.C. § 1132(a)(3)(emphasis added).  Since this statutory provision provides for only "equitable" relief, it cannot be used to impose monetary liability on a participant who fails to reimburse a plan for overpayments.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209-21 (2002).  In *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356 (2006), the Supreme Court explained that a plan could invoke § 1132(a)(3) to seek reimbursement for overpayments "through a constructive trust or equitable lien on a specifically identified fund."  *Sereboff*, 547 U.S. at 363.  The rule established in *Sereboff* is grounded in the understanding that a constructive trust or lien placed on *particular* funds possessed by a defendant constitutes a form of "equitable" relief, whereas a constructive trust or lien placed on a defendant's general assets constitutes a form of "legal" relief.  *Cigna Corp. v. Amara*, 131 S.Ct. 1866, 1878-79 (2011).  In *US Airways, Inc. v. McCutchen*, 663 F.3d 671 (3d Cir. 2011), the United States Court of Appeals for the Third Circuit construed the phrase "appropriate equitable

relief" to mean that courts must exercise their discretion to limit relief provided under §

1132(a)(3) "to what is 'appropriate' under traditional equitable principles." *US Airways,* 663

F.3d at 676.  Consequently, relief that is otherwise available under § 1132(a)(3) may be limited

"through the application of equitable defenses and principles that were typically available in

equity." *Id.*  The relief sought by Principal could only be pursued within the parameters

formulated in *Sereboff* and *US Airways.*

  Although the answer filed by Principal included the affirmative defense that some of the

benefits sought by Laslavic "should be reduced or offset by benefits" integrated with the policy,

it did not include a counterclaim under § 1132(a)(3).  (ECF No. 4 at 3.)  Principal cannot use its

brief as a means of asserting a new claim that does not appear in the pleadings.  *Wolpert v.*

*Abbott Labs.*, 817 F.Supp.2d 424, 437, n.2 (D.N.J. 2011).  The court "will not read causes of

action into [the pleadings] when they are not present." *Krouse v. American Sterilizer Co.*, 126

F.3d 494, 499, n.1 (3d Cir. 1997).  Since no claim under § 1132(a)(3) is before the court, the

extent to which Laslavic may be obligated to reimburse Principal for overpayments need not be

considered at this stage.

  The policy provides that, in the event of an "excess payment," Principal may "reduce

future benefits payable to the [participant] by the full amount of the excess payment," "recover

the excess payment directly from the [participant]," or "take any other legal action."  (ECF No.

1-1 at 26.)  No opinion is expressed about whether the ERISA would pre-empt a state-law cause

of action stemming from the overpayments allegedly made to Laslavic.  *Great-West*, 534 U.S. at

220.  Given Principal's option to "reduce future benefits payable" to an individual who has

received an "excess payment," any "benefits due to" Laslavic under § 1132(a)(1)(B) may be

subject to a setoff.  (ECF No. 31 at 23.)  If Laslavic is able to establish his entitlement to benefits

under the policy, Principal will be able to request that the amount of such benefits be reduced to account for past overpayments.

## V.      Conclusion

Because a genuine issue of material fact exists about whether Laslavic remains "disabled" within the meaning of the policy, Principal's motion for summary judgment will be denied.  (ECF No. 29.)  Because Principal did not assert a counterclaim against Laslavic under § 1132(a)(3), the request for the establishment of a constructive trust will also be denied.  (ECF No. 31 at 20-23; ECF No. 39 at 12-13.)  The court expresses no opinion about whether Laslavic's alleged failure to reimburse Principal for overpayments will operate as a limit on the equitable relief available to him under § 1132(a)(1)(B) in the event that he is found to be "disabled."  An appropriate order follows.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated:  January 23, 2013